**FILED**
August 10, 2026
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY: Christian Rodriguez
DEPUTY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

No. 1:26-cv-01826

**Anoison Electronics, LLC,**
*Plaintiff,*
v.
**Quan, et al.,**
*Defendants.*

## MEMORANDUM OPINION AND ORDER

Plaintiff Anoison Electronics, LLC moves this Court to enter a preliminary injunction that would restrain Defendants Zhou Wei Quan ("Zhou") and Anoison RF, Inc. ("Anoison RF") from conducting a substantial portion of their business. Because an injunction is extraordinary relief—and Plaintiff has not demonstrated entitlement to that relief—the injunction is DENIED.

## BACKGROUND

### A. Factual Background

This case finds it beginnings in 2005. A few key, uncontroverted facts from the record are relevant. In March 2005, Defendant Zhou first registered the main United States domain name (www.anoison.com) for use. *See* ECF No. 19-2 at ¶ 5 ("Zhou Decl."). And in September 2005, Anoison Electronics Ltd. ("Anoison China"), a Chinese company—and the seeming progenitor of the "Anoison" family of companies that now span the globe—made a recorded sale to a U.S.-based customer. *Id.* at ¶ 15. It also appears that Zhou owns and controls Anoison China, Anoison Japan (a Japanese corporation of unknown vintage that helps facilitate sales for Anoison China),

and Anoison RF. *Id.* at ¶¶ 6–7, 14, 33; ECF No. 26 at p. 23 ("Injunction Hearing Transcript").

Two years later, in August 2007, Zhou filed the "ANOISON" trademark application with the U.S. Patent and Trademark Office. Zhou Decl. at ¶ 8; *see also* ECF No. 19-5 ("Trademark Registration") (confirming the registration date as June 9, 2009 and declaring the mark's first use in commerce as April 1, 2008). The Anoison trademark's "goods and services" covers the following: antennas; electrical plugs, sockets, connectors, and cables; connectors for electronic circuits; fiber optic cables; radar receivers with amplifiers; and telecommunications transmitters. Trademark Registration at p. 3.

Almost two years after filing the trademark application, in July 2009, Zhou formed Plaintiff Anoison Electronics, LLC under the laws of New Hampshire and personally retained 99% of the company's shares. Zhou Decl. at ¶ 22. Plaintiff effectively served as the United States distributor for Anoison-branded products and services. Plaintiff facilitated some portion of the overall Anoison-branded product orders for U.S. customers, and then remitted payments back to Anoison China after payment was collected. *Id.* at ¶¶ 16–17. "The purchasing workflow for ANOISON-branded products sold into the United States[,]" however, was "centrally controlled by Anoison China." *Id.* at ¶ 16. And it appears that Anoison China produced *all* products ordered by Plaintiff's customers, set prices for *all* products sold by Plaintiff, and shipped *all* products to U.S. customers directly. *Id.*

From the scattered record provided by the parties, it appears that at least from October 2022, Zhou and some of Plaintiff's employees were prioritizing the acquisition of lucrative U.S. Department of War (then-Defense) contracts. *See* ECF No. 20-1 at pp. 1–5. Because Zhou is a citizen and native of the People's Republic of China, it appears that his control over

and majority ownership (which had dipped to 94%) of Plaintiff would prove to be an insurmountable barrier to defense contracts. *Id.*

So, in 2023, Zhou relinquished his 94% stake in Plaintiff, which by that point had gone through corporate conversion and become a Texas company with its principal place of business in Dripping Springs. Zhou Decl. at ¶ 25; ECF No. 4-2 at p. 1–2 ("Purchase Agreement"). Zhou transferred his shares in slightly unequal proportion to Gregory Pollack, Stephen Young, and William Hallett so that each would own exactly one-third of the business. *See* Purchase Agreement at p. 2. The consideration for this share transfer was simply the option for Zhou to request the shares be transferred back to him if he became a citizen of the United States (or of a Trade Agreements Act compliant country). *Id.* at p. 2. No money changed hands in this transfer. *Id.*; *see also* Injunction Hearing Transcript at pp. 20–21 ("There was no money exchanged here.").

Following the transfer, business continued as usual for a time. Plaintiff continued to sell Anoison-branded products, and Anoison China continued to control the workflow for those products. Zhou Decl. at ¶ 16. But in late January 2026, friction between Zhou and Plaintiff's shareholders began to surface, after what appears to be the death of one of Plaintiff's employees. *See generally* ECF No. 20-2, at pp. 50–62. Through emails with Plaintiff's shareholders, Zhou expressed interest in buying back his shares of Plaintiff and wanted his personal attorney—who is also a Chinese citizen—to look at tax data from the company. *Id.* Hallett and Young rejected this request, expressing serious concern that Zhou's influence and control (or even the perception of influence and control), along with the involvement of a Chinese citizen as legal counsel with access to sensitive documents, would prohibit Plaintiff from landing coveted U.S. defense contracts. *Id.*

With this offer rebuffed, Zhou took a very different, hardball approach to regaining control of U.S. sales of Anoison products: cutting out Plaintiff entirely. Zhou executed a formal trademark assignment in April 2026 purportedly conveying the Anoison trademark to Anoison Japan. Zhou Decl. at ¶ 12. He then created Anoison RF, Inc. as a New Hampshire corporation to be the new U.S. sales arm of Anoison-branded products. *See* ECF No. 4-3 at pp. 6–7, 10–11, 16–20 (records of incorporation and emails from Zhou relaying the plan for Anoison RF). He (or someone affiliated with Anoison RF or Anoison China) then deprived Plaintiff's employees and management of administrative access to the anoison.com website. *See* ECF Nos. 20-3, 4-4. He stopped providing Anoison products to Plaintiff, telling the Court that Plaintiff is no longer authorized to submit orders for or sell Anoison-branded products. Zhou Decl. at ¶¶ 19–21, 63. Moreover, Anoison RF has reached out to Plaintiff's customers telling them that Plaintiff is no longer authorized to sell Anoison products and that they should instead do business with Anoison RF. *See* ECF No. 4-3 at pp. 4–7, 10–11.

**B. Procedural History**

Plaintiff filed a petition against Defendants in Travis County district court on June 16, 2026, asserting claims for trade-secret misappropriation, trademark infringement and unfair competition, tortious interference, harmful computer access, conversion, theft, and breach of contract. Plaintiff alleges that it is the rightful owner of the Anoison trademark, and that by selling Anoison-branded products, Anoison RF and Zhou are infringing on that mark. Plaintiff also alleges that by taking over the Anoison website and email addresses, Anoison RF and Zhou have not only misappropriated Plaintiff's trade secrets, but used those secrets to their business advantage and to Plaintiff's detriment.

At the same time Plaintiff filed its original petition, it requested a temporary restraining order ("TRO"). On the afternoon of June 23, 2026, the district court emailed Zhou the petition along with the request for a TRO and asked for an email response that same day. ECF No. 1-2 at p. 55.[1] Zhou responded shortly thereafter, saying that he "strongly dispute[s] all allegations in the Petition." *Id.* He then said that he was in Japan and that Defendant Anoison RF is a New Hampshire entity, and so asked the district court to "deny or defer the emergency TRO to allow us reasonable time to retain Texas counsel." *Id.*

Three days later, the trial court granted the TRO. *Id.* at pp. 59–60, 64–67. The TRO restrained Defendants from using the Anoison name, controlling its electronic systems, exploiting its confidential information, diverting its business relationships, or passing themselves off as Plaintiff. Despite entering this sweeping relief, the trial court required only a nominal $250 bond. It does not appear from the record that either Defendant was properly served or made an appearance before the TRO was granted.

On July 6, 2026, Anoison RF moved to dissolve or modify the TRO, *see* ECF No. 1-2 at p. 76, and included Zhou's declaration in the motion, *see id.* at pp. 96–110. Among other things, Defendants asserted in the motion that—based on the relevant contract language—Anoison Japan (and before an April 2026 transfer, Defendant Zhou) remains the rightful owner of the Anoison name and trademark. *See also* ECF No. 12 at pp. 7–8. That motion, however, was not resolved because Defendant Anoison RF removed this case from Travis County district

---

[1] The document displays this email's timestamp in Japan Standard Time (UTC+9), the recipient's local zone.

court to this Court the next day. ECF No. 1 at p. 7; ECF No. 1-3.

Once here, Plaintiff moved for a preliminary injunction and requested that the state court TRO be extended beyond its expiration date of July 10, 2026. *See* ECF Nos. 4, 5. This Court declined to extend the TRO, and set an expedited briefing schedule along with a hearing on the injunction. *See* ECF Nos. 13, 25.

## LEGAL STANDARD

As a general matter, injunctive relief is understood to be "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)). A plaintiff seeking a preliminary injunction must show "that 'he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024) (quoting *Winter*, 555 U.S. at 20). The plaintiff bears the burden of proving each element. *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011). Where a party fails to establish a likelihood of success on the merits, the request for injunctive relief may be denied without considering the other elements. *See Valadez v. Paxton*, 553 F. Supp. 3d 387, 399 (W.D. Tex. 2021) (denying relief based solely on the likelihood of success on the merits element); *Kennedy v. Cascos*, 214 F. Supp. 3d 559, 565 (W.D. Tex. 2016) (same).

## ANALYSIS

Plaintiff has not established a likelihood of success on the merits. Without this element, Plaintiff has not cleared the high

bar for the "extraordinary remedy" of preliminary injunctive relief. *Winter*, 555 U.S. at 22.

## I. Plaintiff has not shown that it has ownership of the "ANOISON" trademark.

For Plaintiff to succeed on its trademark infringement claim, it must own the Anoison trademark. *See Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 235–36 (5th Cir. 2010) (noting that the first element in a successful infringement claim is for a given plaintiff to "establish ownership in a legally protectible mark"). Plaintiff does not.

"A trademark infringement action under Texas common law is analyzed in the same manner as a Lanham Act claim." *Viacom Int'l v. IJR Cap. Invs., L.L.C.*, 891 F.3d 178, 184 (5th Cir. 2018). Relevant here, registration of a mark is "prima facie evidence of . . . the registrant's ownership of the mark[.]" 15 U.S.C. § 1115(a). But critically, ownership is established by use—not registration.[2] *Union Nat'l. Bank of Texas, Laredo, Texas v. Union Nat'l. Bank of Texas, Austin, Texas*, 909 F.2d 839, 842 (5th Cir. 1990). The Fifth Circuit has reiterated that "[a]n ownership right 'accrues when goods bearing the mark are placed on the market.'" *Viacom Int'l*, 891 F.3d at 186 (quoting *Blue Bell, Inc. v. Farah Mfg. Co.*, 508 F.2d 1260, 1265 (5th Cir. 1975)).

The trademark was registered to Zhou in 2007, which is *prima facie* evidence of Zhou's ownership. And the Anoison mark was in use by Zhao and Anoison China as early as 2005,

---

[2] This ordering sits in direct opposition to a registration-contingent system, which prevails across much of the world. The principle of "first-in-time, first-in-right" can be traced back to the Byzantine Emperor Justinian and his eponymous sixth-century code. J. THOMAS MCCARTHY, 2 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 16:1 (5th ed. 2026) ("*Qui prior est tempore, potior est jure.*").

when they began making sales of Anoison-branded products in the United States. Plaintiff, however, did not even exist until 2009. So, the trademark must have belonged originally to either Zhou or Anoison China—not Plaintiff.

Anoison Electronics has two theories for how it acquired the trademark.

*First*, it argues that the trademark was transferred prior to 2023 based on the parties' course of conduct, with Plaintiff acting as the rightful owner of the trademark. But the facts of the relationship demonstrate an implied license, not a transfer of the trademark. "Acquiescence to one's use of a trademark is analogous to an implied license to use the mark." *Coach House Rest., Inc. v. Coach & Six Rests., Inc.*, 934 F.2d 1551, 1563 (11th Cir. 1991). And a "court may find an implied license to use a trademark when such a license can be reasonably inferred from the objective conduct of the parties." *Brinkman v. Beaulieu of Am., Inc.*, No. CIV.A. SA-02-CA-268-, 2002 WL 32097534, at *4 (W.D. Tex. Oct. 29, 2002), *aff'd sub nom.*, *Brinkman v. Beaulieu of Am.*, 67 F. App'x 243 (5th Cir. 2003) (per curiam); *see also Doeblers' Pennsylvania Hybrids, Inc. v. Doebler*, 442 F.3d 812, 823–24 (3d Cir. 2006), *as amended* (May 5, 2006).

That is this case. Plaintiff was allowed to use the Anoison brand and sell Anoison products supplied by Zhou and Anoison China as part of an implied license. And there is no evidence or basis in law to conclude that this implied license simultaneously transferred ownership of the mark. *See Turner v. HMH Publ'g. Co.*, 380 F.2d 224, 226–29 (5th Cir. 1967) (holding that use of a licensed mark inures to the benefit of the licensor). Nor is there a basis to conclude that either Zhou or Anoison China abandoned the mark. *See Exxon Corp. v. Oxxford Clothes, Inc.*, 109 F.3d 1070, 1077–80 (5th Cir. 1997) (discussing the concept of naked licensing). After all, Anoison China continues to manufacture and sell products in the United States

and across the globe, and sold its products alongside Plaintiff in the United States. And as sole manufacturer of Anoison-branded products, Anoison China has indisputable domain over quality control of the relevant products.

*Second*, Plaintiff argues that it was assigned the mark as part of the 2023 Purchase Agreement. Plaintiff reasoned in the papers that the share transfer would never have been for an "empty shell" that could not operate independently of Anoison China, but instead that the transfer is *prima facie* evidence that Plaintiff had the trademark all along. *See* ECF No. 20 at pp. 3–5. At the injunction hearing, counsel for Plaintiff argued that "the reality of the transfer" became final in 2023 through the Purchase Agreement. Injunction Hearing Transcript at pp. 6–8. This argument misses the mark.

Looking at the embodiment of the parties' deal—the Purchase Agreement—it is simply a transfer of shares of Plaintiff, from Zhou to three individuals. *See* Purchase Agreement at p. 2. Plaintiff Anoison Electronics was *never* a party to the transfer of its own shares. *Id.* at p. 1. Plaintiff is unable to identify a single provision of the Agreement that would have transferred the specific "ANOISON" mark from Zhou or Anoison China to Plaintiff. The only provision in the contract addressing intellectual property is 6.14 of the Purchase Agreement, which is nothing more than boilerplate language stating that the Company (i.e., Plaintiff) either owns the intellectual property it uses *or* has a valid license to use others' intellectual property. *Id.* at pp. 9–10.

Plaintiff's reading of this provision as a wholesale transfer of ownership of the "ANOISON" mark—a critical asset that enables other Anoison family companies to operate within the United States—proves too much. The Purchase Agreement never states that Plaintiff (a non-party to the Purchase Agreement) is coming into possession of the trademark. And

Plaintiff's argument that it would be an empty shell without ownership of the mark is incorrect; a license (even if revocable at will) to use the "ANOISON" name, general company goodwill, and a pre-existing customer base, are all tangible.

## II. Plaintiff has not shown that Defendants misappropriated trade secrets.

The Texas Uniform Trade Secrets Act ("TUTSA") defines "trade secret" as "all forms and types of information . . . and any . . . code, . . . financial data, or list of actual or potential customers or suppliers, whether tangible or intangible and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing[,]" as long as two conditions are met. TEX. CIV. PRAC. & REM. CODE § 134A.002(6). The first is that "the owner of the trade secret has taken reasonable measures under the circumstances to keep the information secret[.]" *Id.* at § 134A.002(6)(A). The second is that "the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." *Id.* at § 134A.002(6)(B).

Key to a TUTSA claim is that the secret was "misappropriated." Misappropriation is a "disclosure or use of a trade secret of another without express or implied consent by a person who[] used improper means to acquire knowledge of the trade secret[.]" *Id.* at § 134A.002(3)(B). "Actual or threatened misappropriation may be enjoined[.]" *Id.* at § 134A.003(a).

The Court, in interpreting Texas law, must "interpret statutory terms to 'mean what they conveyed to reasonable people *at the time they were written*.'" *Texas Tech Univ. Health Scis. Ctr. – El Paso v. Niehay*, 671 S.W.3d 929, 943 (Tex. 2023)

(Blacklock, J., concurring) (quoting ANTONIN SCALIA & BRYAN GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 16 (2012) (emphasis added)). "Secret," as defined by a relevant dictionary contemporaneous with the passage of TUTSA, is "[s]omething that is kept from the knowledge of others or shared only with those concerned." *Secret*, BLACK'S LAW DICTIONARY (9th ed. 2009). Here, the record does not clearly demonstrate that Plaintiff's alleged trade secrets were, in fact, secret. To the contrary, as Plaintiff admitted, Plaintiff and Zhou (and Zhou's companies) "were sharing these trade secrets throughout" their time as business partners. Injunction Hearing Transcript at p. 34.

Plaintiff accordingly does not contest that the alleged trade secret information, including the identity of customers, website design, and operational marketing information, was shared with Zhou and Anoison China before the swift deterioration of their business relationship in 2026. *Id.* at pp. 26–30. The evidence in the record paints a picture of Zhou having knowledge and high-level access to all (or nearly all) of Plaintiff's inner workings. Of course, there may have been some information kept secret from Zhou and his companies that Zhou has since obtained and used to benefit both himself and Anoison RF. But if such information exists and has been misappropriated, Plaintiff has not identified it. Without a clear showing that the information (as to Zhou) is a "trade secret" at all, Plaintiff is not likely to succeed on the merits of its misappropriation of trade secrets claim.

## CONCLUSION

Plaintiff's motion for preliminary injunction, ECF No. 4, is DENIED.

*So ordered by the Court on August 10, 2026.*

ANDREW DAVIS
United States District Judge